UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN YOW, | : | **1:19-CV-01042** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| CORRECTIONAL OFFICER | : | |
| S. ROBERTSON, *et al*., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**<u>MEMORANDUM OPINION</u>**

**I.  Introduction.**

A fellow prisoner slashed Plaintiff Kevin Yow in the back with a razor.
Yow claims that several of the corrections officer defendants failed to protect him
in violation of the Eighth Amendment.  Yow also claims that other defendants
retaliated against him because he filed grievances about the slashing incident and
about events after the slashing incident.  Currently pending is the defendants'
motion for summary judgment.  For the reasons discussed below, we will grant in
part and deny in part the motion for summary judgment.  More specifically, we
will grant the defendants summary judgment based on qualified immunity as to
Yow's Eighth Amendment failure-to-protect claim.  But we will deny the
defendants summary judgment as to Yow's retaliation claim.

## II.  Background and Procedural History.

Yow, through his counsel, began this action by filing a complaint.  After Yow amended the complaint several times, the operative complaint is the Third Amended Complaint naming the following individuals as defendants: (1) Correctional Officer Robertson; (2) Correctional Officer Macking; (3) Security Lieutenant Gardzalla; (4) Correctional Officer Mabin; (5) Correctional Officer DeLuca; and (6) Correctional Officer John Doe 2.

Yow alleges that in July 2017, in the showers in the Restricted Housing Unit at the State Correctional Institution at Dallas, inmate Kalief Shelton reached through the open wicket between the shower he was in and the shower that Yow was in and slashed Yow in the back with a razor blade.  Yow alleges that after he filed a grievance about the shower incident, defendants Mabin and Gardzalla searched his cell, strip searched him, threatened him with pepper spray, and confiscated a religious text.  And, according to Yow, after he filed a grievance about those events, defendant Gardzalla ordered John Does 1 and 2[1] to search his cell, during which search those officers destroyed or defaced Yow's property.

_____

[1]  The Third Amended Complaint specifically names only one Doe defendant—Correctional Officer John Doe 2—as a defendant. *See doc. 28* at 1, 3 ¶ 10.  And in his Third Amended Complaint, Yow states: "This Amendment adds Defendant Correctional Office[r] DeLuca as the initial John Doe and removes John Doe 1." *Id*. at 2.  Given this, the reference in the body of the Third Amended Complaint to John Doe 1 is unclear.

Yow then called his mother to complain.  And Yow alleges that the day after the second search, he received a misconduct for unauthorized use of the telephone and for threatening defendant Gardzalla.[2]

The Third Amended Complaint contains two counts.  In Count I, Yow claims that defendants Robertson, DeLuca, and Macking violated the Eighth Amendment by failing to protect him from Shelton.   In Count II, Yow claims that defendants Mabin and Gardzalla retaliated against him in violation of the First Amendment.[3]

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.  After the discovery deadline passed but within the deadline set for the filing of dispositive motions, the defendants filed a motion for summary judgment.  That motion has been briefed, and for the reasons discussed below we will grant in part and deny in part that motion.

---

[2]  The Third Amended Complaint actually refers to "Garzales." *Doc. 28* ¶ 56. From the context, however, it appears that this reference was meant as a reference to defendant Gardzalla.

[3]  Although John Doe 2 is named as a defendant in the Third Amended Complaint, *see* n.1, the Third Amended Complaint does not list John Doe 2 as a defendant as to either Count I or Count II. *See doc. 28* at 8.

3

### III.  Summary Judgment Standards.

The defendants move for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary

basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially

'put up or shut up' time for the non-moving party: the non-moving party must

rebut the motion with facts in the record and cannot rest solely on assertions made

in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd.*

*v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.  The Eighth Amendment Failure-to-Protect Claim.

Defendants Robertson, DeLuca, and Macking seek summary judgment in

their favor as to Yow's claim that they failed to protect him from Shelton in

violation of the Eighth Amendment.

### A.  Material Facts.

Local Rule 56.1 requires a party moving for summary judgment to file "a

separate, short and concise statement of the material facts, in numbered

paragraphs, as to which the moving party contends there is no genuine issue to be

tried." M.D. Pa. L.R. 56.1.  The Rule, in turn, requires the non-moving party to file

"a separate, short and concise statement of the material facts, responding to the

numbered paragraphs set forth in the statement required [by the moving party], as

to which it is contended that there exists a genuine issue to be tried." *Id.*  The

"[s]tatements of material facts in support of, or in opposition to, a motion shall

include references to the parts of the record that support the statements," and "[a]ll

material facts set forth in the statement required to be served by the moving party

7

will be deemed admitted unless controverted by the statement required to be served by the opposing party." *Id.*

Here, the defendants filed a statement of undisputed material facts. Yow filed a response in which he admits most of the facts set forth by the defendants. But as to several facts set forth by the defendants, Yow responds by denying the fact and stating, "strict proof demanded at time of trial." *See doc. 53* at ¶¶ 5, 6, 21, 22. And in his response to the defendants' statement of material facts, Yow does not cite to evidence to support those denials. *Id.* Such a denial without citation to record evidence does comply with Local Rule 56.1.

Yow has, however, set forth additional facts in his brief and he provides citations to the record to support some of those facts. Given that Yow is the non-moving party, and we must accept his version of the facts where properly supported, we will accept Yow's version of those facts set forth in his brief that are properly supported by citations to the record. The following facts are the material facts for purposes of the pending summary judgment motion as to the Eighth Amendment failure-to-protect claim.

In July of 2017, the defendants were all employed at the State Correctional Institution at Dallas ("SCI Dallas"). *Doc. 50* ¶ 3; *Doc. 53* ¶ 3. On July 14, 2017, both Yow and Kalief Shelton were incarcerated in the Restricted Housing Unit ("RHU") at SCI Dallas. *Doc. 50* ¶¶ 1, 2, 4; *Doc. 53* ¶¶ 1, 2, 4. Inmates in the RHU

at SCI Dallas are permitted to shower every other day. *Doc. 51-6* at 3.  They must request a shower and be put on a list for a shower. *Id*.  Inmates requesting a shower put their hands through a wicket in their cell door to get handcuffed, and they are then escorted to the showers. *Id*.

The shower area in the RHU consists of a room with two cages. *Id*.  There are two wickets—or apertures—on the shower cages, one on the outside door that is solid, and the other between the two shower cages. *Id*.  One inmate is brought in first, put in the back cage, and then uncuffed through the wicket. *Id*.  Then another inmate is put in the front cage and uncuffed. *Id*.  Pennsylvania Department of Corrections Administrative Directive 6.5.1, Administration of Security Level 5 Housing Units, requires that  shower stalls "be equipped with a lockable aperture through which inmates can be cuff[ed]/uncuffed." *Id*.; *see also doc. 51-13* at 5. DC-ADM 6.5.1 also requires that "[a]ll showers are to be taken in an enclosed shower room with the door locked." *Doc. 51-6* at 3; *Doc. 51-13* at 6.  In July 2017, the aperture between the shower stalls in the RHU at SCI Dallas did not have a locking device; it was just a hole approximately a foot long and a half a foot wide. *Doc. 51-6* at 3–4.

On July 17, 2017, Yow and Shelton were placed in adjacent showers. *Doc. 50* ¶ 11; *Doc. 53* ¶ 11.  After handcuffing Yow in his cell, defendants DeLuca and Macking escorted Yow to the showers. *Doc. 51-6* at 4.  DeLuca and Macking put

Yow in the first shower stall—the one farther from the hallway—and uncuffed him. *Id*.  Defendants Macking and Robertson then put inmate Shelton into the other shower stall. *Id*.

Shelton has a long history of mental illness: he attempted suicide several times, he cut himself on numerous occasions, he was in a mental-health facility, and he had been diagnosed with bipolar 1, PTSD, and borderline personality disorder. *Id*.  Shelton's mental difficulties continued while incarcerated. *Id*.  Shelton was a recent transfer from the nearby State Correctional Institution at Retreat ("SCI Retreat"). *Id*. at 3.  SCI Dallas sometimes gets D Code (the highest stability code for mental illness) inmates from SCI Retreat. *Id*.  Shelton was a D Code inmate. *Id*.  Shelton's father died on July 13, 2017, causing him mental anguish, and he started cutting himself again. *Id*. at 4.

As Shelton was entering the shower, Yow heard him ask if he could go to the POC ("Psychiatric Observation Cell."). *Id*.  After Shelton was told that the POC was full, he then asked to see "psych," and he was told no. *Id*.  Defendant Macking refused Shelton's request for mental assistance. *Id*.

As an inmate enters the showers, he asks for his shower bag. *Id*.  Yow received his shower bag. *Id*.  Defendant Macking offered Shelton a shower bag with a razor. *Id*.  Shelton, who was put on razor restriction on April 4, 2017, while at SCI Retreat, told Macking that he was on razor restriction. *Id*.  Responding that

the razor restriction was from SCI Retreat and did not apply at SCI Dallas, Macking gave Shelton a shower bag with a razor. *Id*.  Yow saw that Shelton received a shower bag with a razor. *Id*.

While in the shower, Shelton, who is familiar with how to break open the razors that are provided in the RHU to access the blade itself, started to cut himself. *Doc. 50* ¶ 13; *Doc. 53* ¶ 13; *Doc. 51-6* at 4.  He then cut Yow. *Id*.  Yow had placed his towel in the aperture of the shower door, rather than on the available hook in the shower stall. *Doc. 50* ¶ 14; *Doc. 53* ¶ 14.  And after the shower was over, Yow turned his back to Shelton to dry off. *Doc. 50* ¶ 15; *Doc. 53* ¶ 15. Shelton reached through the aperture in the door between the shower stalls and cut Yow with the razor. *Doc. 50* ¶ 16; *Doc. 53* ¶ 16; *Doc. 51-6* at 4.  At that time, Yow was standing right next to the door in question with his back turned. *Doc. 50* ¶ 17; *Doc. 53* ¶ 17.

According to Yow, after he finished his shower and was drying off, he felt something go across his back. *Doc. 51-6* at 4–5.  Yow then turned and saw Shelton cutting himself. *Id*. at 5.  When corrections officers came to get Shelton's razor, they told Yow that he was also cut. *Id*.  Yow then turned around and saw that his "boxers and everything was red" from the blood. *Id*.  Yow, who had a five-inch laceration across his lower back that was approximately one-quarter inch wide and

two to three inches deep, was taken to the infirmary, where he received 22 stitches to close his wound. *Id.*  Yow still has pain in his back and a scar. *Id.*

As mentioned, in July 2017, the aperture between the shower stalls did not have a locking device; it was just a hole approximately a foot long and a half a foot wide. *Doc. 51-6* at 3–4.  The wicket was repaired in 2018. *Id.* at 3.  Weekly Fire/Safety/Sanitation Reports failed to note either the deficiency in July 2017 or the repairs done in 2018. *Id.* at 4.  A review of three years of Weekly Fire/Safety/Sanitation Reports indicates that each report is identical in every respect. *Id.*

### B.  Defendants Robertson, DeLuca, and Macking are entitled to summary judgment.

Defendants Robertson, DeLuca, and Macking seek summary judgment as to the Eighth Amendment failure-to-protect claim against them.

Under the Eighth Amendment, prison officials "must 'take reasonable measures to guarantee the safety of . . . inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Thus, prisoners have "a clearly established constitutional right to have prison officials protect [them] from inmate violence."

12

*Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (footnote omitted), *abrogated on other grounds by Bistrian v. Levi*, 912 F.3d 79 (3d Cir. 2018).

But "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Rather, in addition to causation, "[f]or an inmate to prevail on an Eighth Amendment failure-to-protect claim, two requirements must be met." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). "First, the prisoner must demonstrate 'that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Id*. (quoting *Farmer*, 511 U.S. at 834). "This element is satisfied when the alleged 'punishment' is 'objectively sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). "Second, the prison officials involved must have a sufficiently culpable state of mind." *Id*. They must have been deliberately indifferent to a substantial risk to the inmate's health and safety. *Bistrian*, 696 F.3d at 367. "Specifically, the inmate must show that the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Hamilton*, 117 F.3d at 746 (quoting *Farmer*, 511 U.S. at 837).

"Consequently, to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient

evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Id.* "'Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable' on a failure-to-protect claim." *Bistrian*, 696 F.3d at 367–68 (quoting *Farmer*, 511 U.S. at 845).

Defendants Robertson, DeLuca, and Macking contend that they are entitled to summary judgment because Yow cannot show that they placed him in conditions posing an obvious and excessive risk of harm or that they were deliberately indifferent to any such risk. They also contend that they are entitled to summary judgment based on qualified immunity. We conclude that defendants Robertson, DeLuca, and Macking are entitled to qualified immunity.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity ensures that before officers are subjected to suit, they have notice that their conduct is unlawful. *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

14

distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.*  The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  The court is permitted to exercise its discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances of the particular case. *Pearson,* 555 U.S. at 236.  Thus, the court may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.*  In fact, the Supreme Court has stressed "that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *D.C. v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018) (quoting *Camreta v. Greene,* 563 U.S. 692, 707 (2011)).

Here, given that we conclude that the law was not clearly established such as to put defendants Robertson, DeLuca, and Macking on notice that placing Yow

and Shelton in adjacent showers under the circumstances present in the RHU at SCI Dallas violated the Eighth Amendment, we will decide the failure-to-protect claim based on qualified immunity without deciding whether there was, in fact, a constitutional violation.

We thus turn to whether the law was clearly established.  This "qualified immunity analysis looks through the rearview window, not the windshield." *Williams v. Secretary PA Dept. of Corrections*, 848 F.3d 549, 570 (3d Cir. 2017). "The inquiry focuses on the state of the relevant law when the violation allegedly occurred." *Id*.

"To determine whether a right was 'clearly established,' we conduct a two-part inquiry." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).  "First, we must 'define the right allegedly violated at the appropriate level of specificity.'" *Id*. (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012)).  "This requires us to frame the right 'in light of the specific context of the case, not as a broad general proposition.'" *Id*. (quoting *Saucier*, 533 U.S. at 201).  "Second, we must ask whether that right was 'clearly established' at the time of its alleged violation, *i.e.*, whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*. (quoting *Saucier*, 533 U.S. at 202).  "This is an 'objective (albeit fact-specific) question,' where '[an

officer]'s subjective beliefs . . . are irrelevant.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. In other words, "[t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'" *Id.* at 589–90 (internal citations omitted). "It is not enough that the rule is suggested by then-existing precedent." *Id.* at 590. Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.*

Still, "the facts of the existing precedent need not perfectly match the circumstances of the dispute in which the question arises." *Williams*, 848 F.3d at 570. "A public official does not get the benefit of 'one liability-free violation' simply because the circumstance of his case is not identical to that of a prior case." *Peroza-Benitez*, 994 F.3d at 166 (quoting *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004)). But if the law did not put the officer on notice that his conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *Ashcroft*

*v. al-Kidd,* 563 U.S. 731, 741 (2011)).  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *al-Kidd*, 563 U.S. at 743).

Here, defendants Robertson, DeLuca, and Macking contend that given the circumstances surrounding Shelton's attack on Yow, they are entitled to qualified immunity.  As the defendants note, those circumstances include the small opening between the shower stalls (an open aperture of approximately one foot by an half a foot) and the fact that Yow was standing directly in front of that opening with his back to Shelton to dry off. *Doc. 49* at 17.  And the defendants suggest that Yow was standing in the only possible place where Shelton could have reached him. *Id*. at 13.[4]

In response, Yow contends that *Farmer v. Brennan*, 511 U.S. 825 (1994), "has been the leading case in this area for over 25 years and is clearly established law." *Doc. 51-6* at 8.  After Farmer, a transexual who was placed in the general

---

[4]  The parties have not provided the court with the dimensions of the shower stalls. But Yow testified that the shower stall he was in was approximately six feet in length, that he put his towel in the open aperture between the showers stalls rather than on the hook on the other side of the stall, that when Shelton cut him he was standing in front of the open aperture with his back to Shelton, and that an inmate in the other stall would not have been able to reach him if he had been standing in the area where, when turned on, the water comes down. *Doc. 51-3* (Yow Dep. at 27, 37, 38, 45).

population of a male prison, was beaten and raped by another inmate in his cell, he filed suit claiming that prison officials failed to protect him in violation of the Eighth Amendment. *Id*. at 830–31.  In *Farmer*, the Supreme Court summarized that for an Eighth Amendment claim "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm[,]" and that the defendants acted with "deliberate indifference." *Id*. at 834 (footnote omitted).  The issue in *Farmer* was how to define deliberate indifference. *Id*. at 829 ("This case requires us to define the term 'deliberate indifference,' as we do by requiring a showing that the official was subjectively aware of the risk.").  The Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*.  Put another way, the Court held that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id*. at 847.

19

*Farmer* clearly established the standard for deliberate indifference under the Eighth Amendment.  But for qualified immunity purposes the law cannot be defined at such "a high level of generality." *al-Kidd*, 563 U.S. at 742.  "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined" in such a general way. *Sheehan*, 135 S. Ct. at 1776.  Rather, because the qualified-immunity inquiry "focuses on the official's actual situation, the analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition. . . .'" *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Saucier,* 533 U.S. at 201).  In other words, " we examine an official's 'particular conduct' in 'the specific context of the case.'" *Williams v. City of York, Pennsylvania*, 967 F.3d 252,  259 (3d Cir. 2020) (internal citation omitted) (quoting *al-Kidd*, 563 U.S. at 742 and *Saucier,* 533 U.S. at 201).  "Of course, 'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness must be apparent[.]" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal citation omitted).

The circumstances in *Farmer* are not akin to the circumstances in this case. Here, given the circumstances surrounding Shelton's attack on Yow—specifically, the small opening that was the only access that Shelton had to Yow and that Shelton could only reach Yow because he was standing directly in front of that small opening—we conclude that *Farmer* is not sufficient to put reasonable

20

officials on notice that placing Shelton and Yow in adjacent showers under the

circumstances violated the Eighth Amendment.  Although any time an inmate who

expresses mental issues and who is given a razor is placed in proximity to another

inmate, there is some risk of harm.  But the Eighth Amendment is violated only if

the defendants were deliberately indifferent to a substantial risk of serious harm.

Here, given the small opening between the showers, this case involves whether the

risk of harm was substantial.  But in *Farmer*, the Court specifically noted that "[a]t

what point a risk of inmate assault becomes sufficiently substantial for Eighth

Amendment purposes is a question this case does not present, and we do not

address it." 511 U.S. at 834 n.3.  Because *Farmer* did not address when the risk of

harm becomes substantial, we cannot conclude that *Farmer* clearly established that

law in these circumstances. *See Beck v. Hamblen Cty., Tennessee*, 969 F.3d 592,

602 (6th Cir. 2020) (observing that "*Farmer*'s reasonableness test—like the Fourth

Amendment's reasonableness test—does not itself provide 'fair warning' to

Jarnagin that his responses to the risk of inmate-on-inmate violence were

constitutionally inadequate"); *Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043,

1050–51 (9th Cir. 2002) (stating that "it is not sufficient that *Farmer* clearly states

the general rule that prison officials cannot deliberately disregard a substantial risk

of serious harm to an inmate; here, in addition, it is relevant that neither *Farmer*

nor subsequent authorities has fleshed out 'at what point a risk of inmate assault

becomes sufficiently substantial for Eighth Amendment purposes'" (quoting *Farmer,* 511 U.S. at 834 n. 3)).

Given the small opening with which Shelton could assault Yow, this is not an obvious case such that any reasonable official would know that putting Yow and Shelton in adjacent shower stalls violated the Eighth Amendment.  And the parties do not cite, and we are not aware, of any cases with substantially similar facts where the defendants were held to have violated the Eighth Amendment. And so, we conclude that the law was not clearly established such as to put the defendants on notice that placing Yow and Shelton in adjacent shower stalls under the circumstances violated the Eighth Amendment.  Thus, defendants Robertson, DeLuca, and Macking are entitled to qualified immunity.

## V.  The Retaliation Claim.

Defendants Gardzalla and Mabin seek summary judgment in their favor as to Yow's retaliation claim against them.

"Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional." *Bistrian*, 696 F.3d at 376.  "To [establish] a claim for retaliation, a prisoner must [establish] that: (1) he was engaged in constitutionally protected conduct, (2) 'he suffered some "adverse action" at the hands of prison officials,' and (3) 'his constitutionally protected conduct was "a substantial or motivating

factor" in the decision' to take that action." *Wisniewski v. Fisher*, 857 F.3d 152,

156 (3d Cir. 2017) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).

"Once a prisoner has made his *prima facie* case, the burden shifts to the

defendant to prove by a preponderance of the evidence that [he or she] 'would

have made the same decision absent the protected conduct for reasons reasonably

related to penological interest.'" *Carter v. McGrady,* 292 F.3d 152, 158 (3d Cir.

2002) (quoting *Rauser*, 241 F.3d at 334).  Prison officials may prevail by proving

that they would have made the same decision absent the protected conduct for

reasons reasonably related to a legitimate penological interest. *Rauser,* 241 F.3d at

334.

In their statement of material facts, the defendants set forth only the

following four facts regarding the retaliation claim.  On July 24, 2017, defendants

Gardzalla and Mabin were involved in a search of Yow's cell. *Doc. 50* ¶ 20.  The

search was investigative in nature. *Id*. ¶ 21.  These searches are routine. *Id*. ¶ 22.

During the search, a book was confiscated, though it was later returned. *Id*. ¶ 23.

Yow admits the first and fourth of these facts. *See doc. 53* ¶¶ 20, 23.  But as

to the second and third facts, Yow denies the facts stating that the "search was

retaliatory in nature" and that "strict proof demanded at time of trial." *Id*. ¶¶ 21, 22.

As noted above, however, in his response to the defendants' statement of material

facts, Yow does not cite to evidence to support those denials, *id*., and such denials

without citation to record evidence do not comply with Local Rule 56.1.  In his brief, however, Yow sets forth many additional facts purportedly about this search. He sometimes (but sometimes not) cites to the record to support those facts.  And as the defendants point out in their reply brief, in his brief, Yow mixes up testimony regarding two different searches.

Given the above, we conclude that we are simply unable on the current record to decide whether defendants Gardzalla and Mabin are entitled to summary judgment.  Thus, we will deny the defendants' motion as to the retaliation claim without prejudice to the defendants filing another summary judgment motion as to the retaliation claim that is properly teed up and to which Yow properly responds.[5]

---

[5]  Defendants Gardzalla and Mabin contend, among other things, that Yow cannot show that he was subjected to an adverse action because verbal harassment, a cell search, and confiscation of a book do not constitute adverse actions for purposes of a retaliation claim.  They cite some unpublished cases to support that assertion. *See doc. 49* at 19 (citing cases).  But there are other cases that hold otherwise. *See e.g.*, *Humphrey v. Sec'y Pennsylvania Dep't of Corr.*, 712 F. App'x 122, 124–25 (3d Cir. 2017) ("We are doubtful about the District Court's conclusion that Humphrey had not sufficiently pleaded an adverse action, as a retaliatory search and seizure may be sufficient to satisfy this prong of the claim." (citing *Bell v. Johnson*, 308 F.3d 594, 604 (6th Cir. 2002) (citing cases)); *Christian v. Garman*, No. 3:18-CV-1363, 2019 WL 5450573, at *7 (M.D. Pa. Oct. 24, 2019) ("While cell searches are a routine part of prison life, it does not mean that searches which constitute 'calculated harassment unrelated to prison needs' are permissible."  "Thus, a cell search, and the resulting confiscation of property, may nonetheless constitute adverse action 'if motivated solely by a retaliatory motive.'" (internal citations omitted)); *Nichols v. Phillips*, No. 2:17-CV-02604, 2018 WL 286740, at *6 (E.D. Pa. Jan. 3, 2018) ("Although verbal harassment alone does not state a constitutional deprivation, verbal harassment or threats, with some "reinforcing act accompanying them" may establish an adverse action.  A retaliatory search and

## VI. Conclusion.

Based on the foregoing, we will grant in part and deny in part the

defendants' motion for summary judgment.  An appropriate order will issue.

**_S/Susan E. Schwab_**
Susan E. Schwab
United States Magistrate Judge

---

seizure may satisfy the adverse action element of a retaliation claim if the search
and seizure would deter a person of 'ordinary firmness' from the protected
activity." (internal citations omitted)).  Further, as the summary of the allegations
of the Third Amended Complaint earlier in this opinion shows, Yow's retaliation
claim is based on more than a single cell search.  And a '"campaign of harassment
which though trivial in detail may have been substantial in gross"' may amount to
an adverse action. *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (quoting
*Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).  Here, given that the parties
have not adequately set forth the facts as to the retaliation claim, we cannot at this
time determine whether Yow was subjected to an adverse action.